JS 44 (Rev. 06/17) - TXND (Rev. 06/17)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Susan Lanotte, derivatively on behalf of Highland Global Allocation fund, and on behalf of herself and all others similarly situated

## DEFENDANTS

Highland Capital Management Fund Advisors, L.P., Timothy Hui, Bryan Ward, Bob Froehlich, John Honis, Ethan Powell, Highland Global Allocation

**(b)** County of Residence of First Listed Plaintiff    State of New Jersey

*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant    Dallas County, Texas

*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Bruce W. Steckler, Steckler Gresham Cochran, 12720 Hillcrest Rd, Suite 1045, Dallas, TX 75230; 972-387-4040

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1   U.S. Government Plaintiff
- ☐ 2   U.S. Government Defendant
- ☐ 3   Federal Question *(U.S. Government Not a Party)*
- ☒ 4   Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☒ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - Product Liability | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | Pharmaceutical Personal Injury | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | Product Liability | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 340 Marine | ☐ 368 Asbestos Personal Injury Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) | ☐ 345 Marine Product Liability | **PERSONAL PROPERTY** | **LABOR** | ☐ 835 Patent - Abbreviated New Drug Application | ☐ 460 Deportation |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards Act | ☐ 840 Trademark | ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☒ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 380 Other Personal Property Damage | ☐ 740 Railway Labor Act | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 362 Personal Injury - Medical Malpractice | ☐ 385 Property Damage Product Liability | ☐ 751 Family and Medical Leave Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 196 Franchise | | | | ☐ 863 DIWC/DIWW (405(g)) | ☐ 890 Other Statutory Actions |
| | | | | ☐ 864 SSID Title XVI | ☐ 891 Agricultural Acts |
| | | | | ☐ 865 RSI (405(g)) | ☐ 893 Environmental Matters |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement Income Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 899 Administrative Procedure Act/Review or Appeal of Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate Sentence | | | |
| ☐ 240 Torts to Land | ☐ 443 Housing/ Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 445 Amer. w/Disabilities - Employment | ☐ 535 Death Penalty | **IMMIGRATION** | | |
| ☐ 290 All Other Real Property | ☐ 446 Amer. w/Disabilities - Other | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 448 Education | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration Actions | | |
| | | ☐ 550 Civil Rights | | | |
| | | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - Conditions of Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1   Original Proceeding
- ☐ 2   Removed from State Court
- ☐ 3   Remanded from Appellate Court
- ☐ 4   Reinstated or Reopened
- ☐ 5   Transferred from Another District *(specify)*
- ☐ 6   Multidistrict Litigation - Transfer
- ☐ 8   Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Sec. 1332(a)(2), 28 U.S.C. Sec. 1332(d)(2), 28 U.S.C. Sec. 1391(a)

Brief description of cause:
Derivative Claim for Breach of Fiduciary Duty, Breach of Contract, Breach of Implied Covenant of Good Faith Fair Dealing

## VII. REQUESTED IN COMPLAINT:

☒ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:

JURY DEMAND:   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____

DOCKET NUMBER _____

DATE   09/05/2018

SIGNATURE OF ATTORNEY OF RECORD   /s/Bruce W. Steckler

**FOR OFFICE USE ONLY**

RECEIPT # _____    AMOUNT _____    APPLYING IFP _____    JUDGE _____    MAG. JUDGE _____

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| SUSAN LANOTTE, derivatively on behalf of HIGHLAND GLOBAL ALLOCATION FUND, and on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., TIMOTHY HUI, BRYAN WARD, BOB FROEHLICH, JOHN HONIS, and ETHAN POWELL,<br><br>Defendants,<br><br>and<br><br>HIGHLAND GLOBAL ALLOCATION FUND,<br><br>Nominal Defendant. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | CIVIL ACTION NO: _____<br><br>**DEMAND FOR JURY TRIAL** |

**VERIFIED SHAREHOLDER DERIVATIVE AND
CLASS ACTION COMPLAINT**

Plaintiff Susan Lanotte ("Plaintiff"), through her attorneys, derivatively and on behalf of

Nominal Defendant Highland Global Allocation Fund (the "Global Allocation Fund"), files this

Verified Shareholder Derivative and Class Action Complaint against the trustees of Highland

Funds II (the "Trust") and the manager of the Global Allocation Fund, Highland Capital

Management Fund Advisors, L.P. (the "Investment Advisor").  The allegations here are based on

personal knowledge as to Plaintiff and her own acts, and upon information and belief (including

the investigation of counsel and review of publicly available information) as to all other matters stated.

## <u>NATURE OF THE ACTION</u>

1.      It is a flagrant fiduciary breach for a trustee of several mutual funds to permit the investment advisor to use one of those mutual funds to buy the shares in a failing mutual fund to save the failing fund from oblivion and lower the costs incurred by the investment advisor.

2.      The Investment Advisor manages the investments of a series of mutual funds of the Trust, including the Global Allocation Fund and the Highland Energy MLP Fund (the "MLP Fund"), and the trustees of the Trust owe fiduciary obligations to the Global Allocation Fund and the MLP Fund.  The trustees allowed the Investment Advisor to use the Global Allocation Fund to buy shares in the MLP Fund to save the MLP Fund from collapsing and stem the losses incurred by the Investment Advisor when oil prices dropped and the MLP Fund plummeted in value.

3.      James Dondero ("Dondero") is an owner of the Investment Advisor and controls the general partner of the Investment Advisor.  He is also the senior portfolio manager of both the Global Allocation Fund and the MLP Fund.  He formally took over the MLP Fund in early 2015, after oil prices dropped nearly 50% and the value of the "master limited partnerships" that the MLP Fund invested in were plummeting.  The MLP Fund was dropping so fast in value that the fund could not support its fee structure, such that the Investment Advisor would incur an increasing amount of expenses that it would not be reimbursed for.  Dondero and the Investment Advisor then used the much larger Global Allocation Fund to buy shares in the MLP Fund to save the failing MLP Fund and stem the losses incurred by the Investment Advisor.

4.      The Global Allocation Fund and its shareholders were damaged as a result of the related-party transactions.  The MLP Fund reported a negative 43% return in the fiscal year ended

September 30, 2015, a negative 16% return in fiscal 2016, a negative 10% return in fiscal 2017, and negative 16% return for the first six months of fiscal 2018. The MLP Fund performed far worse than its benchmark index and far worse that its peer group during that time. Yet while incurring damage to the Global Allocation Fund, the Investment Advisor was getting paid advisory fees by having the Global Allocation Fund buy and hold shares in the MLP Fund. And by propping up the MLP Fund and saving it from collapse, the Investment Advisor was able to lower its unreimbursed costs and save itself from being stuck with large, unreimbursed expenses it would have incurred in a fund liquidation.

5.     The Global Allocation Fund owned nearly 64% of the MLP Fund's total shares as of the close of fiscal 2015 on September 30, 2015, and as of the most recently reported SEC filings for the first six months of fiscal 2018, owned nearly 63% of the MLP Fund's total shares. Without the Global Allocation Fund's purchase of the MLP Fund shares, the MLP Fund's total assets would have only been $8.25 million, which is far lower than the amount of funds needed to support an economically viable mutual fund. Indeed, the Investment Advisor in the past has closed funds that dropped to sub-$10 million asset levels.

6.     The Investment Advisor's use of the Global Allocation Fund to purchase MLP Fund shares violated the terms of the Investment Advisor's contract with the Global Allocation Fund. By allowing the Investment Advisor to use the Global Allocation Fund to prop up the MLP Fund, the trustees of the Global Allocation Fund violated their fiduciary obligations owed to the Global Allocation Fund and its shareholders. The trustees of the Global Allocation Fund are conflicted because they are also trustees of the MLP Fund that benefitted from the related-party transactions and were paid fees for serving as trustees of the MLP Fund.

7.     The Investment Advisor's actions also constituted a breach of its contract with the Global Allocation Fund to provide investments for the fund and properly manage the fund, and a breach of the implied covenant of good faith and fair dealing that is imposed on every contract subject to Delaware law.

8.     Plaintiff brings this action as a derivative action and as a class action to recover damages for the trustees' breach of fiduciary duty to the Global Allocation Fund and its shareholders and for the Investment Advisor's breach of the advisory agreement to properly manage the Global Allocation Fund.

## JURISDICTION AND VENUE

9.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. §1332(a)(2) in that Plaintiff and Defendants are citizens of different states, and the matter in controversy exceeds $75,000, exclusive of interests and costs.  This action is not a collusive one to confer jurisdiction on a court of the United States that it would not otherwise have.

10.     This Court also has jurisdiction over the class action claim herein (Count IV) pursuant to 28 U.S.C. §1332(d)(2), as it is a class action for damages in excess of $5 million, and at least one defendant is a citizen of a different state than Plaintiff.

11.     This Court has jurisdiction over Defendants because each Defendant either conducts business in and maintains operations in this District, or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

12.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because (i) one or more of the Defendants either resides in or maintains executive or director offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including

Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iii) the Investment Advisor has received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

13.     Plaintiff is a shareholder of the Global Allocation Fund and has continuously owned shares of the Global Allocation Fund since March 9, 2015.  Plaintiff is a citizen of New Jersey.

14.     Defendant Investment Advisor is a Delaware limited partnership with its principal place of business in Dallas, Texas.  The Investment Advisor manages the Global Allocation Fund, MLP Fund, and the other funds held in the Trust and a related trust, Highland Funds I.  At all times relevant herein, the Investment Advisor has transacted business in this District.  The Investment Advisor is owned by Highland Capital Management Services, Inc. and Strand Advisors XVI, Inc., both of which are Delaware corporations and principal place of business is in Texas.  Highland Capital Management Services, Inc. is owned in part by Dondero.  Strand Advisors XVI, Inc. is wholly owned by Dondero.  Strand Advisors XVI, Inc. is the general partner of the Investment Advisor.  The Investment Advisor is a citizen of Delaware and Texas.

15.     Nominal Defendant Global Allocation Fund is a fund in the Trust's portfolio and managed by the Investment Advisor.  The Global Allocation Fund is one of the portfolio funds of the Trust, which is a Massachusetts business trust that comprises seven funds managed by the Investment Advisor.  The Global Allocation Fund's strategy is to seek long-term growth and future income by investing "in a portfolio of U.S. and foreign equity, debt and money market securities," with "at least 50% of its net assets in equity securities and at least 40% (plus any borrowings for investment purposes) of its net assets in securities of non-U.S. issuers."  Dondero has been the primary individual portfolio manager for the Global Allocation Fund since April 2013.  The Global

Allocation Fund is traded under the symbols "HCOAX" for Class A shares, "HCOCX" for Class C shares, and "HCOYX" for Class Y shares. The Global Allocation Fund, with its principal place of business in Dallas, Texas, is a citizen of Texas.

16. Defendant Timothy K. Hui has been an "indefinite term" trustee of the Global Allocation Fund and the MLP Fund since the inception of the Trust in 2006. Hui is a trustee for 25 fund portfolios in the Trust complex. He has no other experience as a corporate trustee or director. Hui is a citizen of Pennsylvania.

17. Defendant Bryan A. Ward has been an "indefinite term" trustee of the Global Allocation Fund and the MLP Fund since the inception of the Trust in 2006. Ward is a trustee for 25 fund portfolios in the Trust complex. Ward is a citizen of Texas.

18. Defendant Bob Froehlich has been an "indefinite term" trustee of the Global Allocation Fund and the MLP Fund since December 2013. Froehlich is a trustee for 25 fund portfolios in the Trust complex. Since retiring as an executive at The Hartford Mutual Funds in 2013, Froehlich has worked as a professional trustee of various investment and mutual funds. Notably, Froehlich was a trustee of two funds managed by American Realty Capital Partners, a firm that has since foundered with admissions of a massive, multi-year accounting fraud that took place while Froehlich was a trustee of ARC Realty Finance Trust, Inc. from January 2013 to May 2016 and a director of American Realty Capital Daily Net Asset Value Trust, Inc. from November 2012 to July 2016. American Realty Capital Partners' former Chief Accounting Officer, Lisa McAlister, pleaded guilty in October 2016 to accounting fraud charges and inflating the value of the fund's shares. American Realty Capital Partners' former Chief Financial Officer, Brian Block, was indicted in September 2016 and found guilty in June 2017 of securities fraud. He was sentenced to 18 months in prison. Froehlich is a citizen of Illinois.

19.     Defendant John Honis has been an "indefinite term" trustee of the Global Allocation Fund and the MLP Fund since July 2013.  Honis was a partner in Highland Capital Management, L.P. ("HCM") from February 2007 until November 2014.  Dondero is the founder and President of HCM.  Honis is a trustee for 25 fund portfolios in the Trust complex.  While the Trust labels Honis as an independent trustee, the Trust acknowledges that Honis has a continuing interest in the Investment Advisor and that "the U.S. Securities and Exchange Commission might in the future determine Mr. Honis to be an interested person of the Trust.  Indeed, Honis and the Investment Advisor continue to have interlocking business interests and agreements.  Honis and the Investment Advisor are parties to an agreement governing Honis's severance and deferred compensation.  Pursuant to that agreement, Honis is still owed $880,000 in aggregate severance and/or deferred compensation from another affiliate of the Advisor.  Honis has also been director of and received compensation from two of two companies that are controlled by clients of HCM.  Honis in 2016 or 2017 also became a trustee of a trust that owns substantially all of the economic interest in an entity affiliated with the Investment Advisor, whereby Honis indirectly receives an asset-based fee in respect of such interest.  Honis is a citizen of New York.

20.     Defendant Ethan Powell has been an "indefinite term" trustee of the Global Allocation Fund and the MLP Fund and Chairman of the Board since December 2013.  Powell was Executive Vice President and Principal Executive Officer of the Trust from June 2012 to December 2015; was Chief Product Strategist of the Investment Advisor from 2012 until December 2015; and was Senior Retail Fund Analyst of HCM from 2007 until December 2015.  Powell is a trustee for 25 fund portfolios in the Trust complex.  Powell is not considered an independent trustee of the Trust because of his connections with the Investment Advisor.  Powell is named as a defendant based on his role as a trustee of the Global Allocation Fund at all relevant

times and based on his role as Principal Executive Officer of the Trust until December 2015. Powell is a citizen of Texas.

21.      Defendants Hui, Ward, Froehlich, Honis, and Powell are collectively referred to as the "Trustee Defendants."  The Trust, the Investment Advisor, and the Trustee Defendants are collectively referred to as the "Defendants."

## THE TRUSTEE DEFENDANTS' DUTIES

22.      By reason of their positions at the Trust and because of their ability to control the business and corporate affairs of management of the Global Allocation Fund and selection and monitoring of the Investment Advisor, the Trustee Defendants owed the Global Allocation Fund and its shareholders fiduciary obligations of good faith and loyalty, and were and are required to use their utmost ability to control and manage the Global Allocation Fund in a fair, just, honest, and equitable manner.  Each of the Trustee Defendants owes to the Global Allocation Fund and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Global Allocation Fund and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

23.      The Global Allocation Fund's corporate documents (such as the August 10, 1992 Declaration of Trust, as amended and operative at relevant times herein) provide that trustees of the Trust may be personally liable and not indemnified by the Trust to the extent that their actions arise from bad faith, willful misfeasance, gross negligence, or reckless disregard of their duties under Massachusetts law.

24.      Defendant Powell, as the Principal Executive Officer of the Trust until December 2015 and an executive of the Investment Advisor, was also subject to a Code of Ethics for the Global Allocation Fund whereby he was required to "not cause the Fund to take action, or fail to

take action, for the individual personal benefit of the Covered Officer rather than the benefit of the Fund." Powell violated the Trust's Code of Ethics because as executive of the Investment Advisor he personally benefitted from the related-party transactions complained herein and failed to take action to prevent those related-party transactions, which continue to harm the Global Allocation Fund. Powell also violated the Code of Ethics by failing to failing to self-report.

## THE INVESTMENT ADVISORY AGREEMENT

25.     The Investment Advisor manages each fund within the Trust under the terms of an agreement with each fund, which has a two-year term and is then renewed each year by the Trustee Defendants.

26.     The Investment Advisor provides the day-to-day management of a fund's portfolio of securities, which includes buying and selling securities. In return for its advisory services, each fund in the Trust pays the Investment Advisor a contractual monthly fee based on a fund's average daily managed assets and other fees.

27.     The terms of the Investment Advisor's management of the Global Allocation Fund are set forth in a February 18, 2011 Amended and Restated Investment Advisory Agreement (the "Advisory Agreement") between the Global Allocation Fund and the Investment Advisor, which was signed by Powell on behalf of the Investment Advisor.

28.     The Advisory Agreement provides that the Investment Advisor will manage the fund, subject to the control of the Trust's board of trustees, and the provisions of the Registration Statement and Prospectus for the Global Allocation Fund.

29.     According to the relevant Prospectus for the Global Allocation Fund, the investment objective and principal investment strategies of the Global Allocation Fund are as follows:

**Investment Objective**

The investment objective of Highland Global Allocation Fund ("Highland Global Allocation Fund" or the "Fund") is to seek long-term growth of capital and future income (future income means the ability to pay dividends in the future).

\*       \*       \*

**Principal Investment Strategies**

The Fund seeks to achieve its investment objectives by investing in a portfolio of U.S. and foreign equity, debt and money market securities. Under normal market conditions, the Fund intends to invest at least 50% of its net assets in equity securities and at least 40% (plus any borrowings for investment purposes) of its net assets in securities of non-U.S. issuers.  While the Fund's investments in securities of non-U.S. issuers may from time to time represent less than 40% of its net assets, the Fund intends to invest approximately 30% or more of its net assets in securities of non-U.S. issuers at all times.  For purposes of determining whether securities held by the Fund are securities of a non-U.S. issuer, a company is considered to be a non-U.S. issuer if the company's securities principally trade on a market outside of the United States, the company derives a majority of its revenues or profits outside of the United States, the company is not organized in the United States, or the company is significantly exposed to the economic fortunes and risks of regions outside the United States.

30.     The Prospectus also identifies the type of equity securities the Global Allocation Fund may invest in, with a primary focus on large cap U.S. and foreign companies, as follows:

Equity securities in which the Fund may invest include common stock, preferred stock, securities convertible into common stock, rights and warrants or securities or other instruments whose price is linked to the value of common stock.  Although the equity securities in which the Fund invests may be of any capitalization, may be denominated in any currency and may be located in emerging markets without limit, the Fund will primarily invest in equity securities of large capitalization companies (meaning a market capitalization of $2 billion or more) that are located in developed markets.

31.     Though there is a contractual relationship between the Investment Advisor and each fund in the Trust, the Investment Advisor is not a mere contractor providing investment services. Rather, as is typical in mutual funds, the Investment Advisor and its affiliates are the creators, sponsors, and promotors of the funds.  The Advisory Agreement acknowledges that the Investment Advisor has fiduciary obligations to the Global Allocation Fund.

32.     In addition to the contractual and fiduciary relationship, the Investment Advisor, the Trust, and the Global Allocation Fund are intertwined through shared personnel.  Until December 2015, for example, the President and Principal Executive Officer of the Trust (defendant Powell) was also the Chief Product Strategist of the Investment Advisor.  Powell's replacement as President and Principal Executive Officer of the Trust (J. Bradley Ross) has been the President of the Investment Advisor since June 2012.

33.     The Advisory Agreement further provides that the Investment Advisor may be held liable to "the [Global Allocation Fund] or its shareholders" for conduct arising by reason of bad faith, willful misfeasance, gross negligence, or reckless disregard of their duties under Delaware law.

### DEFENDANTS DIRECTED OR ALLOWED THE GLOBAL ALLOCATION FUND TO BAIL OUT THE MLP FUND, THEREBY BENEFITTING THE MLP FUND AND THE INVESTMENT ADVISOR

34.     The Trust was formed as a Massachusetts business trust on August 10, 1992.  At the time, the Trust was known as the "GE Investment Portfolios" and later the "GE Funds," and held a series of funds under the GE name.  After GE exited the mutual fund business, the Trust in February 2011 changed its name to Highland Funds II and was effectively merged into an affiliation with the Investment Advisor.

35.     The Investment Advisor had been managing a series of funds through Highland Funds I, a Delaware statutory trust formed on February 28, 2006.

36.     Like the Trust, Highland Funds I is managed by the Investment Advisor.

37.     The Trustee Defendants are trustees of both the Trust and Highland Funds I.

### *Common Management and Trusteeship of the Global Allocation Fund and the MLP Fund*

38.     The Trustee Defendants have overall management responsibility for all funds in the Trust (as well as all funds in Highland Funds I).

39.     Dondero took over as the primary individual portfolio manager for the Global Allocation Fund as of April 2013, when the fund changed its name from the "Highland Core America Equity Fund" to "Highland Global Allocation Fund."

40.     Whereas the prior fund focused on a U.S. equity strategy the fund as renamed as the Highland Global Allocation Fund adopted a revised investment strategy where the fund would compare its performance to the FTSE All-World Index, in addition to the S&P 500 Index.

41.     The MLP Fund had a different investment objective and different investment strategy than the Global Allocation Fund.

42.     The investment objective of the Global Allocation Fund was "long-term growth of capital and future income," and the investment objective of the MLP Fund was focused on current income.

43.     The Global Allocation Fund also focused on large cap companies (market cap $2 billion or more) with at least 40% of investment in assets of non-U.S. issuers, and the MLP Fund invested at least 80% of its assets solely in master limited partners in the energy sector, almost all of which are U.S. securities.

44.     The prospectus for the MLP Fund identifies the principal investment strategies of

the MLP Fund:

**Principal Investment Strategies**

The Fund seeks to achieve its investment objective by investing primarily in master limited partnership ("MLP") investments.  Under normal market conditions, the Fund intends to invest at least 80% of its net assets (plus any borrowings for investment purposes) in a portfolio of MLPs investments, as defined below.  This investment policy may be changed by the Fund upon 60 days' prior written notice to shareholders.  MLPs typically are characterized as "publicly traded partnerships" that qualify to be treated as partnerships for U.S. federal income tax purposes and are principally engaged in one or more aspects of the exploration, production, processing, transmission, marketing, storage or delivery of energy-related commodities, such as natural gas, natural gas liquids, coal, crude oil or refined petroleum products (collectively, the energy industry).

45.     Dondero is the senior portfolio manager for the MLP Fund.

46.     The contractual fees paid to the Investment Advisor vary from Global Allocation

Fund to the MLP Fund.  For the Global Allocation Fund, the contractual fee is 0.40% of the average

daily managed assets in the fund; for the MLP Fund, the contractual fee is 1.00% of the average

daily managed assets in the fund.

47.     Fees to cover operating expenses are also subject to different limits for the two

funds.  For the Global Allocation Fund, there is a limit or "cap" of 0.65% of average daily managed

assets; for the MLP Fund, the cap is 1.10% of average daily managed assets for the MLP Fund.

Thus, a dollar invested in the MLP Fund generates greater fees for the Investment Advisor and is

subject to a higher level of operating expense reimbursement for the Investment Advisor than a

dollar invested in the Global Allocation Fund.

***Dondero Formally Takes Over Management of the MLP Fund and Engages in Related Party Transactions to Use the Global Allocation Fund to Buy Shares in the MLP Fund as the MLP Fund Plummets***

48.     According the Portfolio Manager Commentary section in the fiscal year 2015 Annual Report, the Global Allocation Fund started its 2015 fiscal year on September 30, 2015 with "no exposure to MLPs."  That was a false statement.  In fact, the Global Allocation Fund owned 936,170 shares of the MLP Fund as of the end of fiscal 2014 and the start of fiscal 2015.

49.     Dondero was the senior portfolio manager of the Global Allocation Fund and was formally added as the senior portfolio manager for the MLP Fund in January 2015.  Dondero, as senior portfolio manager of both the Global Allocation Fund and the MLP, accelerated the use of funds from the Global Allocation Fund to buy shares in the MLP Fund.  At the time, all of the other funds in the Trust were managed by other portfolio managers, so the only assets Dondero had direct management control of to bail out the MLP Fund were assets of the much larger Global Allocation Fund.

50.     During the first few months of 2015, Dondero more than doubled the Global Allocation Fund's investment in the MLP Fund.

51.     Dondero's use of the Global Allocation Fund to buy shares in the MLP Fund coincided with a cataclysmic drop in the price of oil in late 2014 and 2015, when investors were fleeing energy MLPs.  Crude oil was trading for $94.45 per barrel on September 30, 2014 and had dropped to $50.42 per barrel in late January when Dondero became the senior portfolio manager of the MLP Fund.

52.     The MLP Fund was hemorrhaging cash at the time because lower oil prices resulted in negative returns for the MLP Fund.  As a press release from the Investment Advisor in 2015 has

Dondero admit, "Dislocation in the energy sector has caused unwarranted disruptions in the MLP space."

53.     Dondero and the Investment Advisor used the Global Allocation Fund to buy shares in the MLP Fund and thereby prop up the MLP Fund and thus keep it at a size that made it still an attractive investment, which served to stem a run for the exits from existing investors in MLP Fund, and by signaling confidence in MLP Fund through its investment, Global Allocation Fund helped to attract new investors into MLP Fund.    From 2015-2017, the Global Allocation Fund owned between 51.93% to 62.06% of the MLP Fund.

54.     Dondero and the Investment Advisor also benefitted because the negative returns in the MLP Fund meant that the MLP Fund had shrunk to a size where it could no longer support its fee structure; thus, threatening the very survival of the fund.

55.     The Trust had no measures in place to approve related-party transactions even though the Trustee Defendants knew the Investment Advisor was having one fund buy the shares of another fund.  This lack of protections led to a November 2015 $2 million transaction that violated compliance procedures and had to be reversed and was a net loss for the Global Allocation Fund.  While the Investment Advisor reimbursed the Global Allocation Fund that time, the fact that the Trust did not have measures in place to approve related-party transactions is itself a failure of the Trustee Defendants' oversight.  By claiming that investment by Global Allocation Fund into MLP Fund was "exempt" from compliance procedures because an SEC rule allows an investment advisor to invest in related mutual funds, Defendants concede that they actually had no safeguards in place to ensure the propriety of these inter-fund share purchases.

56.     Because the Trustee Defendants were trustees for multiple funds, they had divided fiduciary obligations in weighing the interests of one fund over another fund.  Yet the Trust did

not have a conflicts committee or any other process whereby one or more of the Trustees would be charged with protecting the interests of one of the funds in transactions involving another of the funds.  The Trustee Defendants instead permitted the related-party transactions to the detriment of the Global Allocation Fund and its shareholders.

57.    Between January 1, 2015 and March 31, 2015, the Global Allocation Fund under Dondero's direction bought or allowed to be reinvested over 1.4 million shares of the MLP Fund. (The aggregate amount of these purchases was first disclosed in a Semi-Annual Report for the six months ended March 31, 2015, which was filed with the SEC on June 5, 2015.)

58.    Between March 31 and September 30, 2015, Dondero acquired or allowed to be reinvested more than 1 million more shares of the MLP Fund as the NAV of that fund had dropped over 29% during that six-month period.

59.    In sum, the MLP Fund for the fiscal year ended September 30, 2015 returned negative 43.12% for Class A shares, negative 43.55% for Class C shares, and negative 43.01% for Class Y shares (not including sales charges, which would have resulted in even lower returns). Notably, while lower oil prices impacted all energy MLPs, the MLP Fund performed far worse than the MLP Fund's benchmark index for the same period (the Alerian MLP Index at negative 38.36%) and far worse than the MLP Fund's Morningstar peer group, US OE Equity Energy (which, excluding the MLP Fund returned an average of negative 33.86% during the same period).

60.    Dondero's purchase of the MLP Fund shares was material to the Global Allocation Fund and material to the MLP Fund.  MLP Fund had $40.8 million of net assets at the end of fiscal year 2015, but only because the Global Allocation Fund bought over $26.4 million worth of MLP Fund shares that year.  At the end of fiscal year 2014, MLP Fund had $33 million of assets, including an $11 million purchase by Global Allocation Fund.  Not counting the shares bought by

the Global Allocation Fund, MLP Fund would have had $22 million in assets at the end of fiscal year 2014 and $14.4 million of assets at the end of fiscal year 2015. Thus, Global Allocation Fund effected a bailout of MLP Fund: without the cash infusion from the Global Allocation Fund, the MLP Fund would have lost almost $8 million between fiscal years 2014 and 2015. Instead, the MLP Fund was able to gain almost $8 million that year.

61.     The MLP Fund was not able to support its fee structure with so few assets under management. For instance, the MLP Fund's sunk costs far exceeded the 1.1% expense cap of $158,400 the Investment Advisor would be stuck with for a $14.4 million fund. Even with the Global Allocation Fund taking a massive 64% stake in the MLP Fund, the Investment Advisor incurred $101,941 in expenses in excess of the expense cap for fiscal 2015 that the Investment Advisor would not be reimbursed for. Moreover, if the Global Allocation Fund had not made its investments, the assets under management would be significantly smaller in the MLP Fund, and the Investment Advisor would have had to reimburse it even more for expenses.

62.     Dondero and the Investment Advisor used the Global Allocation Fund to buy MLP shares and offset the sales of MLP shares by public investors. By the end of fiscal 2015, the Global Allocation Fund owned 3,470,087.42 shares of the MLP Fund, representing nearly 64% of the MLP Fund's total shares.

63.     Dondero used the Global Allocation Fund because it was the only fund in the Trust with enough assets to make such a large investment. The Global Allocation Fund, with over $2 billion in assets in 2015, was more than three times the size of all of the other funds in the Trust's portfolio combined at the end of fiscal 2015.

64.     The MLP Fund continued to plummet in value in fiscal 2016, as oil hit a new low of $33.89 per barrel in late January 2016.

65.     Despite the dramatic decline in the sector and in the MLP Fund's performance, the Investment Advisor allowed dividends to be re-invested in the MLP Fund, did nothing to reallocate investments out of the MLP Fund, and was allowed to do so by a supine Board.

66.     During that same 6-month period, the value of the MLP Fund shares dropped by over 50%, from $25.97 million as of September 30, 2015, to $12.36 million as of March 31, 2016. Absent purchases by the Global Allocation Fund, the net assets of the MLP Fund would have been just $9.5 million as of March 31, 2016, which would have further lowered the cap on expenses the Investment Advisor would be permitted to recoup.  Even with the Global Allocation Fund propping up the MLP Fund, the Investment Advisor incurred $157,627 in expenses above the expense cap for the first six months of fiscal 2016, and for which the Investment Advisor would not reimbursed.

67.     In sum, the Investment Advisor continued to acquire additional shares of MLP Fund through its automatic reinvestment of MLP Fund dividends, and took no steps to reallocate existing investments away from MLP Fund, during fiscal 2016, when the MLP Fund recorded returns of negative 15.98% for Class A shares, negative 16.49% for Class C shares, and negative 16.14% for Class Y shares (all reported without adding in sales charge).  The MLP Fund continued to sharply underperform the Alerian MLP Index, which reported a positive 12.74% return for the same period, and underperform compared to its Morningstar peer group, which returned an average of 14.67% during the same period.  This is significant.  The Investment Advisor's choice to buy MLP Fund shares for the Global Allocation Fund instead of buying a competing fund that invested in MLPs or into the benchmark index meant that the Global Allocation Fund incurred a double-digit percentage loss instead of a double-digit percentage gain.

68.     Dondero and the Investment Advisor directly benefitted from the related-party transactions in several respects.  The transactions generated fees for the Investment Advisor, saved

the MLP Fund from becoming an unmarketable investment product with few assets, and lowered the unreimbursed expense costs the Investment Advisor was forced to incur.

69.     The Investment Advisor incurred $458,560 in expenses above the expense cap for the MLP Fund in fiscal 2016.  The expenses for which the Investment Advisor would not be reimbursed would have been far higher absent the use of the Global Allocation Fund to hold approximately 52.7% of the MLP Fund's shares as of September 30, 2016.

70.     The Investment Advisor continued to acquire MLP Fund shares for the Global Allocation Fund through automatic reinvestments, and continued to refrain from divesting in the Fund, through fiscal 2017 and fiscal 2018.  Meanwhile, the MLP Fund continued to sink in performance.  The MLP Fund recorded fiscal 2017 returns of negative 10.35% for Class A shares, negative 11.26% for Class C shares, and negative 10.32% for Class Y shares, and again underperformed the Alerian MLP Index (returned negative 3.70%) and Morningstar peers (average returned negative 2.53%) for the same period.  The Global Allocation Fund owned nearly 61% of the MLP Fund's total shares as of the close of fiscal 2017 on September 30, 2017.  During the first six months of fiscal 2018, the MLP Fund recorded returns of negative 16.50% for Class A shares, negative 16.89% for Class C shares, and negative 16.47% for Class Y shares.  The Global Allocation Fund owned nearly 63% of the MLP Fund's total shares as of the close of the first six months of fiscal 2018.  Without the shares owned by the Global Allocation Fund, the MLP Fund would have just $8.3 million in assets under management, would be unable to cover its expenses, and would face a liquidation in which the Investment Advisor would lose its fees for managing the fund and lose its ability to recoup any reimbursement for expenses it incurred in excess of the expense cap.  As of the most recent SEC filings, the Investment Advisor is owed over $1 million in deferred expenses.

71.     The Global Allocation Fund and its shareholders have suffered damages because of Defendants' actions.

## PLAINTIFF COMPLIED WITH THE STATUTORILY REQUIRED DEMAND ON THE BOARD OF TRUSTEES AS TO DERIVATIVE CLAIMS

72.     Plaintiff brings Counts I through III of this action derivatively in the right and for the benefit of the Global Allocation Fund to redress the breaches of fiduciary duty and other violations of law by the Trust and the Trustee Defendants, as well as contractual breaches by the Investment Advisor.

73.     On March 1, 2018, Plaintiff made a formal demand to the board of trustees of the Global Allocation Fund and Trust under MASS. GEN. LAWS ch. 156D §7.42.

74.     On April 17, 2018, Plaintiff's counsel was notified that the Trustees had appointed a Demand Review Committee (the "Committee") composed of defendants Ward and Froehlich to review the matters raised in Plaintiff's demand.

75.     To assist the Committee with its investigation, Plaintiff provided documents on May 3, 2018, corresponded with the Committee over the course of three months, agreed to extend the 90-day statutory period for the Committee's investigation in exchange for a tolling agreement on the statute of limitations, and attended a telephone conference with the Committee and the Committee's counsel on July 20, 2018.

76.     On August 3, 2018, Plaintiff's counsel was notified that the Committee had rejected Plaintiff's demand.

## THE COMMITTEE IMPROPERLY REJECTED PLAINTIFF'S DEMAND

77.     The Committee issued a report to the Board, dated July 30, 2018, recommending that the Board not move forward with any litigation, owing to an allegedly low recovery and high litigation costs.  The Committee's rejection of the demand was improper, however, because it

failed to meaningfully address the inherent conflicts of interest of the Trustee Defendants that Plaintiff had raised in her Demand.  The Committee also failed to meaningfully address the Trustee Defendants' duty to monitor investments and to allow automatic reinvestment into MLP Fund even when it became clear the MLP Fund, and the sector it was investing in, was tanking.

78.     The Committee's report did not meaningfully address the inherent conflicts presented by having Trustees serve on multiple fund boards except to assert that policies and procedures would prevent Board directors from favoring one fund over another.  Instead, the Committee claimed that most of the Trustees were independent because they did not work for the Investment Advisor.

79.     The members of the Committee suffer from a disabling conflict of interest and could not meet the requirement to act in good faith in compliance with MASS. GEN. LAWS ch. 156D §7.44.

80.     The Committee was unable to properly evaluate a demand because the members of the Committee themselves face personal liability for alleged breaches of fiduciary duty in their roles as Trustee Defendants: Ward has been a Board member since 2006, and Froehlich has been on the Board since 2013.  The allegations in Plaintiffs' Demand, covering investments that began in 2014, span the period in which Ward and Froehlich were directors.  Thus, both Ward and Froelich are being asked to evaluate whether a lawsuit should be commenced against them.

81.     The Committee's method for choosing independent counsel was also conflicted, as it chose counsel based on the Board's counsel's recommendation.  But the Board's counsel, despite being characterized as "independent trustee counsel," is not truly independent because the entire Board suffers from the conflict that they may be subject to personal liability because they are

subjects of Plaintiff's allegations that they breached their fiduciary duties to the Global Allocation Fund.

82.    Moreover, by the Committee's own admission, Powell and Honis were interested and not independent for at least part of the relevant period.

83.    Furthermore, all of the Trustee Defendants (including the Committee members) lack independence and are interested because they each serve as trustees of both the Global Allocation Fund and MLP Fund.  Because they are directors of both funds, they owe fiduciary obligations to both.  This dual role creates an inherent conflict because, during the relevant period, the MLP Fund benefited at the cost of the Global Allocation Fund as a result of the related-party transactions complained of herein.  Absent the Global Allocation Fund's purchase of MLP Fund shares, the MLP Fund would have been liquidated.  But owing to the MLP Fund's poor performance, the Global Allocation Fund's investment in the MLP Fund's shares dragged down the Global Allocation Fund's performance.  And the benefits to the MLP—along with the attending costs to the Global Allocation Fund—continue to the present, as the Global Allocation Fund continues to own nearly 63% of the MLP Fund's total shares.  If the Global Allocation Fund sold those shares, the MLP Fund would shrink to just $8.3 million in assets under management, would be even more incapable of covering expenses, and would have to liquidate.  The Trustee Defendants cannot faithfully serve two masters with conflicting interests and cannot properly consider a demand to pursue litigation where the outcome of that litigation would result in harm to the MLP Fund to whom the Trustee Defendants owe fiduciary obligations.

84.    The Trustee Defendants are also unable to properly consider a demand because they face a substantial likelihood of liability for their role in permitting the related-party transactions to use the Global Allocation Fund to bail out the MLP Fund.  Each Trustee Defendant is alleged to

have violated their fiduciary duties to the Global Allocation Fund in allowing it to bail out the MLP Fund.  As such, the Trustee Defendants are being asked to evaluate whether they themselves should be sued.  It would be unrealistic to expect a Trustee Defendant to admit to personal wrongdoing and to, in essence, agree to sue himself.

85.     In addition, the Trustee Defendants knew from experience that they faced a substantial likelihood of liability for their role in bailing out the MLP Fund using the Global Allocation Fund.  The Investment Advisor's use of the Global Allocation Fund to buy shares of the MLP Fund was reported in the SEC filings of the Trust and the Global Allocation Fund and MLP Fund and known to the Trustee Defendants, as was the declining performance of the MLP Fund declining amount of assets under management in the MLP Fund.  The Trustee Defendants knew from their prior experience that once a fund's assets under management drop into the $10 to $15 million range, the fund will be unable to cover its expenses and will close.  For example, the Trustee Defendants authorized the liquidation of one of the funds in the Trust, the Highland Dividend Equity Fund, after that fund reported poor results of roughly negative 7% for fiscal 2015 and its assets under management had dropped to $12.3 million.  The Highland Dividend Equity Fund had reported near 10% average gains since its inception in 2011, yet the Trustee Defendants knew that just one bad year of negative returns and investor outflow caused the liquidation of the fund in January 2016.

86.     The Committee defends the Trustee Defendants' actions by claiming that almost all Global Allocation Fund investments into the MLP Fund occurred before the MLP Fund and the sector began to significantly decline in performance.  The Committee, however, does not address the Trustee Defendants' breach of fiduciary duties through their inactions.  Despite their previous experience with underperforming funds, the Trustee Defendants chose to allow automatic

reinvestment into the MLP Fund despite knowing that the MLP Fund and the sector it was investing in was tanking. Yet the Trustee Defendants, owing to the investment experience, knew that by the second half of 2015, the entire MLP sector —including the investments comprising the MLP Fund—was in a "tailspin," as the Committee's report acknowledges. The Trustee Defendants took no action to stem the Global Allocation Fund's investments in the MLP Fund or to re-allocate existing investments even though they knew that, absent the investment from the Global Allocation Fund, the MLP Fund had just $10.7 million in assets as of the end of fiscal 2017, had reported three years of disastrous returns, and could no longer to cover its expenses. Instead, the Trustee Defendants simply renewed the Advisory Agreement each year and allowed automatic reinvestments without any effort to comply with their fiduciary obligations and take remedial action on behalf of the Global Allocation Fund. Simply put, the Trustee Defendants knew of the wrongdoing but failed to act in the face of a known duty to act. For these reasons, each of the Trustee Defendants face a substantial likelihood of liability for their participation in the illicit acts.

87. The Committee also acted in bad faith when it prematurely determined that it could not bring claims based on the 2014 and January and February 2015 transactions, without considering how the automatic reinvestment of proceeds and the fact that these transactions continued into the non-time-barred period could bring them into the statute of limitations period either under a relation-back or continuing-wrong theory. Moreover, the 2015 transactions would not have been time-barred because the these transactions to Global Allocation Fund's investors were not disclosed until the semi-annual report on form NSAR-A that was filed with the SEC on May 29, 2015, which was well within the period of the statute of limitations. As a result, while the Committee reviewed the 2014 and early 2015 transactions, there are serious questions about

whether the seriousness and thoroughness with which they considered these transactions, when they thought claims relating to these transactions were time-barred in any event.

88.    The Committee also threw out a red herring by pointing out how Plaintiff allegedly conflated the Global Allocation Fund's investments in the MLP sector with investments in the MLP Fund.  This distinction is immaterial to Plaintiff's allegations, however, because it does not address the inherent conflict presented by the Trustee Defendants allowing the Global Allocation Fund to bail out the MLP Fund by investing in it, allowing automatic reinvestments, and refusing to reallocate investments, once it became clear the MLP Fund was tanking.

## CLASS ACTION ALLEGATIONS AS TO THE CLASS CLAIM

89.    Plaintiff brings Count III of this action on her own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a Class consisting of all holders and/or beneficial owners of shares in the Global Allocation Fund at any time on or after January 1, 2015, excluding Defendants and the officers, directors, and trustees of the Defendants, heirs, successors, or assignees of any of the Defendants or their officers, directors, or trustees, any entity in which any Defendant has a controlling or substantial interest.

90.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time, and can only be ascertain through appropriate discovery, Plaintiff believes that hundreds if not thousands of persons and/or entities held shares in the Global Allocation Fund and sustained losses as a result of Trustee Defendants' misconduct as alleged herein.  Investors in the Global Allocation Fund can be identified from records maintained by Defendants and may be notified of the pendency of this action by mail or other means.

91.     Plaintiff's claims are typical of the claims of the other members of the Class because they arise from the Trustee Defendants' breaches of fiduciary, which the Trustee Defendants uniformly owed to all Class members.  If cases were brought and prosecuted individually, each member of the Class would be required to prove the same claims based upon the same facts, pursuant to the same remedial theories, and would be seeking the same relief.

92.     Common questions of law and fact exist to all members of the Class and predominate over any questions solely affecting individual members of the Class, including whether the Trustee Defendants breached their fiduciary duties to the Class, and the amount of damages incurred by the Class as a result of the wrongful acts alleged herein.

93.     A class action is superior to all other available methods of fair and efficient adjudication of the controversy since joinder of all members is impracticable.  As the damages suffered by each Class member may be relatively small, the expense and burden of individual litigation make it impossible for all members of the Class to individually redress the wrongs done to them.  There will be no difficulty in managing this action as a class action.

94.     In addition, prosecution of separate actions by Class members would create a risk of establishing incompatible standards of conduct for the Trustee Defendants.  Prosecution of separate actions would also create a risk of adjudication with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

95.     Plaintiff is an adequate representative of the Class, has retained skilled counsel with extensive experience in litigation of this nature, and will fairly and adequately protect the interests of the Class.  Plaintiff has no interests which conflict with those of the Class.

## COUNT I

## DERIVATIVE CLAIM AGAINST THE TRUSTEE DEFENDANTS
## FOR BREACH OF FIDUCIARY DUTY

96.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

97.     This claim is brought by Plaintiff derivatively on behalf of the Global Allocation Fund.

98.     The Trustee Defendants are trustees of the Global Allocation Fund and owe fiduciary duties to the Global Allocation Fund under Massachusetts law.

99.     The Declaration of Trust for the Global Allocation Fund provides that trustees of the Trust may be personally liable and not indemnified by the Trust to the extent their actions arise from bad faith, willful misfeasance, gross negligence or reckless disregard of their duties under Massachusetts law.

100.     The Trustee Defendants' misconduct as alleged herein constitutes bad faith, willful misfeasance, gross negligence or reckless disregard of their duties under Massachusetts law.  The Trustee Defendants allowed the Global Allocation Fund to bail out the MLP Fund, which harmed the Global Allocation Fund.

101.     In addition, Powell, as the Principal Executive Officer of the Trust until December 2015 and an executive of the Investment Advisor, was subject to a Code of Ethics for the Global Allocation Fund whereby he was required to "not cause the Fund to take action, or fail to take action, for the individual personal benefit of the Covered Officer rather than the benefit of the Fund."  Powell violated the Code of Ethics because as executive of the Investment Advisor he personally benefitted from the related-party transactions complained herein and failed to take

action to prevent those related-party transactions.  Powell also violated the Code of Ethics by failing to failing to self-report.

102.     By reason of the foregoing acts, practices, and courses of conduct, the Trustee Defendants have breached their fiduciary obligations owed to Global Allocation Fund and are not entitled to indemnification by the Trust.

<u>**COUNT II**</u>

**DERIVATIVE CLAIM AGAINST THE INVESTMENT ADVISOR**
**<u>FOR BREACH OF CONTRACT</u>**

103.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

104.     This claim is brought by Plaintiff derivatively on behalf of the Global Allocation Fund.

105.     The Advisory Agreement is a binding agreement under Delaware law between the Global Allocation Fund and the Investment Advisor.

106.     All obligations required of the Global Allocation Fund under the Advisory Agreement have been satisfied.

107.     Among other things, the Investment Advisor was required under the Advisory Agreement to provide an investment program and management services to the Global Allocation Fund consistent with the representations in the Global Allocation Fund's Proxy.  The Advisory Agreement did not allow the Investment Advisor to use the Global Allocation Fund to bail out the MLP Fund in order to further the selfish interests of the Investment Advisor, to the harm of the Global Allocation Fund.  The Investment Advisor thus breached the Advisory Agreement.

108.     As a proximate result of the Investment Advisor's breaches of the Advisory Agreement, the Global Allocation Fund has suffered, and will continue to suffer, damages in an amount Plaintiff will prove at trial.

## COUNT III

### DERIVATIVE CLAIM AGAINST THE INVESTMENT ADVISOR FOR BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

109.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

110.     This claim is brought by Plaintiff derivatively on behalf of the Global Allocation Fund.

111.     The implied covenant of good faith and fair dealing is implied into all contracts subject to Delaware law, including the Advisory Agreement.

112.     The Investment Advisor breached the covenant of good faith and fair dealing implied into the Advisory Agreement by bailing out the MLP Fund to further the interests of the Investment Advisor to the detriment of the Global Allocation Fund and its shareholders.

113.     The Investment Advisor acted unreasonably in engaging in the misconduct alleged herein to further its own interests, thereby frustrating the benefits of the bargain of the Advisory Agreement reasonably expected by Global Allocation Fund.

114.     The Investment Advisor's breach of the implied covenant of good faith and fair dealing has caused and will continue to cause the Global Allocation Fund to suffer damages in an amount Plaintiff will prove at trial.

## COUNT IV

### CLASS ACTION CLAIM FOR BREACH OF FIDUCIARY DUTY
### AGAINST THE TRUSTEE DEFENDANTS

115.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

116.    This claim is brought by Plaintiff individually and on behalf of the Class.

117.    The Trustee Defendants are trustees of the Global Allocation Fund and owe fiduciary duties to shareholders of the Global Allocation Fund under Massachusetts law.

118.    The Declaration of Trust for the Global Allocation Fund provides that trustees of the Trust may be personally liable and not indemnified by the Trust to the extent that their actions arise from bad faith, willful misfeasance, gross negligence or reckless disregard of their duties under Massachusetts law.

119.    The Trustee Defendants' misconduct as alleged herein constitutes bad faith, willful misfeasance, gross negligence or reckless disregard of their duties under Massachusetts law.  The Trustee Defendants allowed the Global Allocation Fund to bail out the MLP Fund, which lowered the net asset value of the Global Allocation Fund's shares and damaged shareholders.

120.    Under such circumstances, a fund trustee's breach of fiduciary duties may be enforced directly by shareholders of the fund under Massachusetts law.

121.    By reason of the foregoing acts, practices, and courses of conduct, the Trustee Defendants have breached their fiduciary obligations owed to Plaintiff and the other members of the Class, and are not entitled to indemnification by the Trust.

### RELIEF REQUESTED

Plaintiff demands judgment as follows:

A.    Determining that this action is a proper derivative action as to Counts I through III;

B.      Awarding against all Defendants and in favor of the Global Allocation Fund the amount of damages sustained by the Global Allocation Fund as a result of the Trustee Defendants' breaches of fiduciary duty and the Investment Advisor's breach of contract and breach of the covenant of good faith and fair dealing;

C.      Directing the Global Allocation Fund to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with the Company's existing governance obligations and all applicable laws and to protect the Company and its shareholders from a recurrence of the damaging events described herein;

D.      Alternatively, certifying this case as a class action as to Count IV and certifying Plaintiff as Class representative and her counsel as Class counsel;

E.      Awarding damages and equitable relief to Plaintiff and the Class, along with pre-judgment and post-judgment interest;

F.      Directing the Trustee Defendants to account to Plaintiff and the Class for all damages suffered by them as a result of the Trustee Defendants' wrongful conduct alleged herein;

G.      Awarding Plaintiff the costs, expenses, and disbursements of this action, including any attorneys' and experts' fees and expenses; and

H.      Granting Plaintiff such other relief as this Court deems just, equitable, and proper.

## **JURY DEMAND**

In accordance with Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury in this action of all issues so triable.

Dated: September 5, 2018

/s/ *Bruce W. Steckler*

Bruce W. Steckler
bruce@stecklerlaw.com
**STECKLER GRESHAM COCHRAN**
12720 Hillcrest Road, Suite 1045
Dallas, TX 75230
Telephone: 972-387-4040
Fax:  972-387-4041

James S. Notis
Meagan A. Farmer
jnotis@gardylaw.com
mfarmer@gardylaw.com
**GARDY & NOTIS, LLP**
126 East 56th Street, 8th Floor
New York, NY 10022
Telephone: 212-905-0509

Michael J. Barry
Jon T. Pearson
mbarry@gelaw.com
jpearson@gelaw.com
**GRANT & EISENHOFER P.A.**
123 Justison Street
Wilmington, DE 19801
Telephone: 302-622-7000

*Counsel for Plaintiff*

## **VERIFICATION**

I, SUSAN LANOTTE, hereby declare and verify that I am a shareholder of the Highland Global Allocation Fund.  I have reviewed and authorized the filing of the attached complaint and based upon the discussions with and reliance upon my counsel, as to those facts upon which I have personal knowledge, the facts therein are true and correct to the best of my knowledge, information and belief.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: *August 28,2018*

*Susan Lanotte*

SUSAN LANOTTE